## LAWRENCE and others *against* DALE and others.

Where two persons are joint proprietors of certain *patent* rights and privileges, as for navigating vessels by steam, one of them on the mere ground of such joint interest or concern, is not responsible for any special contract or undertaking, entered into by the other with any assignee of such right or privilege, not connected with the enjoyment and exercise of their common privilege under the patent.

Where one party intends to abandon or rescind a contract, on the ground of a violation of it by the other, he must do so, promptly and decidedly, on the first information of such breach. If he negotiates with the party, after knowledge of the breach, and permits him to proceed in the work, it is a waiver of his right to rescind the contract.

The defendants contracted with the plaintiffs to be responsible for the perfect construction and performance of certain steam boats, to be built on the river *Ohio*, so that they should carry one hundred tons burden, and run four miles an hour in still water : *Held*, that the plaintiffs could not, after the boats were built, rescind the contract on their part, and recover back the money advanced by them to the defendants, on the alleged ground that the boats drew too much water to navigate the river, without having first put the fitness of the boats to navigate the river, in the manner agreed on by the parties, to the test of experiment.

THE bill, which was filed on the 28th of *November*, 1815, stated, that the late *Robert Fulton*, deceased, (whose executors, *Harriet Dale* and *William Cutting*, were made defendants,) in his life-time, about the 11th of *February*, 1809, and the 9th of *February*, 1811, obtained certain *patents*, for applying the power of steam to the purposes of

1817.

LAWRENCE
v.
DALE.

October 1.

navigation, in which patents the late *Robert R. Livingston* was equally interested, by virtue of an *agreement*, entered into between them, in 1802, (set forth in the bill,) and, also, by one or more *assignments* of the said patent rights, from *Fulton* to *Livingston*, and supposed to be in the power of the defendants, *Edward P. Livingston* and *Robert L. Livingston* ; and that in consequence thereof, and by virtue of certain arrangements between them, they became *co-partners*, and equally concerned, in the construction and employment of steam boats, and in all undertakings and establishments therewith connected; and that they erected, at their joint expense, and for their joint benefit, work-shops, &c. in the state of *New-Jersey* and elsewhere, for building and repairing steam boats; and, particularly, did erect such workshops and buildings, on their joint account, at or near *Pittsburgh*, in the state of *Pennsylvania*, for the purpose of building steam boats to navigate the *Ohio* and *Mississippi*, and other waters communicating with those rivers. That the said *co-partners*, in the beginning of the year 1813, jointly published and circulated *proposals*, throughout the *United States*, inviting persons to form companies and establish steam boats on the navigable waters of the *United States*, under the patents of the said co-partners, &c. And one or more companies having been formed, for the purpose of navigating the *Ohio* and *Mississippi*, below the falls, the said co-partners, at their workshops, at or near *Pittsburgh*, actually built, by their own workmen and engineers, and under the superintendance of their agents, the steam boats required for the use of the companies so formed, who, however, furnished the requisite funds. That *Robert R. Livingston* died on the 23d of *February*, 1813, and all his rights and privileges in the said co-partnership became vested in his widow, and his two sons-in-law, as the husbands of his surviving children, and subsequently, after the death of their mother, in *October*, 1813, in the said *Edward P. Livingston* and *Robert L. Livingston*, defendants, who

thereafter possessed and enjoyed all the right, interest, and property of the said *R. R. L.* deceased, in the said co-partnership. That the principal, if not exclusive, management of the concerns of the said co-partnership, after the death of the said *R. R. L.* devolved on the said *Robert Fulton*, who became the active partner, and conducted the same for the joint benefit, and upon the joint responsibility of himself, and of the said representatives of the said *R. R. L.* That for their joint benefit, and in order to connect with the line of steam boats running from *Louisville* to *New-Orleans*, another line of steam boats, to run *above* the *falls* of the *Ohio*, from *Pittsburgh* to *Louisville*, the said *Fulton*, to facilitate the formation of a company for that purpose, employed *Benjamin H. Latrobe* as an agent, who issued the *proposals* set forth in the bills, with the consent and approbation of *F.* and the defendants, *E. P. L.* and *R. L. L.* who were, then and afterwards, equally concerned with *F.* in the property and concerns of the said co-partnership, and received a proportion of the profits thereof; which proposals were, soon after, accepted and agreed to by some of the plaintiffs, and others, who formed themselves into a company to carry the same into effect, and subscribed the same, with the sums paid by them respectively, upon a printed copy of the said proposals. That the said *E. P. L.* and *R. L. L. knew* of the said proposals, and must have consented to, and approved of them, as they never gave any notice whatever of their disagreement to them, or of their unwillingness to be bound by them. That of the *one hundred shares* specified in the first articles, *eighty-seven* were subscribed in *New-York*, by certain of the plaintiffs, whose names were set forth in the bill; and the *thirteen* remaining shares were reserved by *Fulton*, with the intention that they should be subscribed for by persons resident in *Pittsburgh* and its vicinity, and that any facts in regard to them are unknown

to the plaintiffs. That the plaintiffs paid to *Fulton*, as the *acting partner*, not only the full amount of their respective subscriptions, but a large sum of money over and above the same, to which they were induced, after considerable progress had been made in building the steam boat, for the purpose of adding to the original plan a *freight boat*, to be towed by the steam boat, upon the plan and at the solicitation of *F*. That in consequence of this alteration of the original plan, a more formal agreement was entered into between *F*. and *E. P. L.* and *R. L. L.*, of the first part, and the plaintiffs, of the second part, dated the 7th of *January*, 1815, which was executed only by *Fulton*, of the one part, and several of the plaintiffs, who represented 56 shares; but which, as the bill stated, was to be executed, as soon as convenient, by *E. P. L.* and *R. L. L.* and the rest of the plaintiffs. That the plaintiffs, in proportion to their respective interests, advanced to *F.*, as acting partner, in divers sums, and at various times, which were particularly set forth in the bill, to the amount of 33,660 dollars, over and above the sums subscribed by them, and had also expended 100 dollars in obtaining an act of the legislature of *Pennsylvania*, in favour of the plaintiffs and *F*. and *E. P. L.* and *R. L. L.* That in *February*, 1815, *F*. died, leaving his wife and *William Cutting*, his brother in law, two of the defendants, trustees of his estate, and guardians of his children, under his will, made on the 13th of *December*, 1814, and that the widow had since intermarried with the defendant, *Dale*. That the said steam boat had never been completed, and that it would require about 15,000 dollars for that purpose. That she has been built in an unskilful and unworkman-like manner, and is, moreover, from her great draught of water, wholly unfit for the navigation contemplated in the proposals, and would be, therefore, if completed, of no use to the plaintiffs. That in consequence thereof, and of the lapse of a great portion of the exclusive privilege of the patentees, by which their

hope of remuneration is greatly diminished, the plaintiffs are unwilling to make any further advances under the agreement; and they insisted that they ought not to be called on to make further advances; but have a right, in consequence of the *defaults* of *Fulton* and *L.*, in their lifetime, and of the defendants, since their deaths, to apply for a dissolution of the contract, and for a repayment of their money. That the plaintiffs had, in consequence of those defaults, made a demand in writing of the defendants, of the repayment of the principal and interest of the money advanced, and waiving any claim to damages.

The bill charged that the defendants were not only jointly interested in the patents, but in the different shops and buildings for constructing steam-boats, and especially in those at *Pittsburgh;* and to show this joint interest, the bill set forth articles of an agreement between *F.* and *E. P. L.* and *R. L. L.* in *July*, 1814, expressly recognising their joint interest and concern, under the agreement of the 10th of *October*, 1802, between *F.* and *R. R. L.* and referring also to the boat building by the defendants or their agents, for the plaintiffs: That *Latrobe* was the *agent* of all the patentees, in publishing the *proposals*, and acted with their knowledge and approbation; and the stipulation that the boat should be built under the direction and responsibility of the patentees was a material inducement to the plaintiffs to form the company, and to engage in the boat. That before any advances were made by the plaintiffs, the *proposals* by *Latrobe* were read by *E. P. L.* and *R. L. L.*, who knew that the plaintiffs were acting on the faith of those proposals, but never made known their disapprobation, or disavowal thereof; and that even if *Latrobe* and *Fulton* acted without the authority of *E. P. L.* and *R. L. L.*, yet their silence and concealment of the fact was, under the circumstances, fraudulent, and rendered them responsible to the full extent of the proposals.

The bill prayed that the defendants might be decreed to refund to the plaintiffs all the moneys advanced by them, with interest and damages; that the executors of *Fulton* might admit *assets* sufficient, or render a true account of the same; that the plaintiffs might be relieved from the performance of the covenants contained in the *proposals*, or in the agreement of the 7th of *February*, 1815, and that those proposals, and that agreement, might be cancelled, and that the partnership formed thereby might be dissolved, and for general relief.

The answer of the executor and executrix of *Fulton* admitted the material facts stated in the bill.

*E. P. L.* and *R. L. Livingston* also put in their answer, in which, among other things, they denied that the work shops and establishments at *Pittsburgh*, as stated in the bill, were erected and owned by *Fulton* and *R. R. L.* but they have heard, and believe, that they were erected by the *Mississippi Company*, or their agent, and are now owned, or have been sold, by them; and that the boats for the purpose of navigating the *Mississippi* and *Ohio*, below the falls, were built, as they believe, by the company or their agents, and not by the agents and workmen of *Fulton* and *Livingston.* That if *Fulton* took upon himself to employ agents or workmen for the purpose, so as to become responsible for their skill and fidelity, they are satisfied that he did it without the knowledge or approbation of *R. R. Livingston,* in his life time, so as to create no responsibility therefor on his legal representatives; and they denied that they had incurred any such responsibility by any act or consent of theirs, or by any act or omission of *Fulton,* by their approbation or authority. They admitted that part of the funds for the construction of the said boat or boats was furnished by the companies, but they stated that there was a deficiency which was supplied by, or on the credit of *Fulton,* in the first instance, but in which they, by a subsequent arrangement, became interested with *Ful-*

*ton*, and the amount of which advances was still due to them and to his estate. That the defendants were, in a great measure, ignorant of the acts and transactions of *Fulton*, in relation to steam boats in other places, and they insisted that if he had entered into, such engagements and responsibilities as are stated in the bill, they are, in no respect, personally liable therefor, except so far as they may be so, as a necessary consequence of their interest in the patents and exclusive grants relative to steam boats and the construction and employment thereof; and they positively denied that they, or *Mary Livingston*, to their knowledge, ever did, directly or indirectly, authorize *Fulton* so to act, or to enter into any such negotiations or contracts as are stated in the bill; and they denied that *Latrobe* ever was employed by them, or by *Fulton*, with their consent or knowledge, as agent for the purposes, and with the powers mentioned in the bill, or in any way to make them answerable to the plaintiffs for his acts. They admitted, however, that they had heard that *F.* or some person for him, but who, they did not know, had issued proposals to establish, by means of a company, a steam boat on the *Ohio, above the falls ;* but never having seen them before they were issued, nor since, unless transiently and without examination, in print, and having no copy of them, they could not speak with certainty as to them. That they did not know when they were issued and circulated, but if at the time stated in the bill, it was before they were interested in steam boat rights and property, and so they could not be bound by such proposals. They denied that they were ever consulted at all in relation to such proposals, or that the said *Mary Livingston*, to their knowledge or belief, was consulted, or had any personal knowedge of, or ever, in any way, assented to them. They denied all personal knowledge of the formation of the company, by the plaintiffs, under the said proposals, though they had heard

of, and believed the fact; and they denied all agreement with the plaintiffs, or either of them, or by *F.*, never having given him any authority, expressly or tacitly, to bind them, in any manner, to the terms of the said proposals or agreement, or for the appointment of an agent at *Pittsburgh*, or elsewhere; and they denied having known or adopted the said proposals before the formation of the said company; and they admitted that they had never expressed any disapprobation of the proposals, or taken any measure to caution the plaintiffs, or others, that they did not intend to be bound thereby, &c. That they were ignorant of the inducement which led to the agreement of the 7th of *January*, 1815, stated in the bill; that they were never, at any time, consulted on the subject, nor did they or any person, by their authority, ever consent to execute that agreement, nor were they ever requested so to do; and that they were not, therefore, bound to fulfil the same, as parties thereto. They admitted their joint interest with *F.* or his representatives, to the amount of two thirds of the interest of *R. R. L.*, in the rights, privileges, and property of steam boats, in the life time of *Mary Livingston*, and in the whole of that interest since her decease. That the machinery for the boats, as they are informed and believe, was made in new workshops, erected at or near *Pittsburgh*, by the *Ohio Company* or their agent, *Latrobe*, in which workshops, the said defendants never, to their knowledge or belief, had any interest. That *Latrobe* never was the agent of the said defendants, unless he could be made their agent without their knowledge or consent, except so far as they may have been interested in the said steam and tow boats of the plaintiffs, in consequence of their being part owners of the patent rights and privileges.

The material parts of the evidence are sufficiently stated in the opinion delivered by the court.

The cause was argued in *July* last, by *T. A. Emmet* and *J. L. Riker*, for the plaintiffs, and, by *Riggs*, *S. Jones*, *jun.*, and *Baldwin*, for the defendants.

The cause stood over for consideration, and the following opinion, was, this day, delivered by the court.

THE CHANCELLOR. The representatives of *Fulton*, and the two *Livingstons*, place their defence on very different grounds. The latter deny that *Fulton* had any authority to bind them, in whatever responsibility *he* may have incurred in his negotiations with the complainants.

I shall first consider the demand as it respects the defendants, *Edward* and *Robert Livingston*.

1. The only part of the printed proposals issued by *Latrobe*, in the spring of 1813, which contains any thing like a special covenant, is in the 3d and 4th articles, in which it is declared, that the boat shall be calculated to carry freight, and shall be built under the immediate direction of the patentees, who shall appoint an agent at *Pittsburgh* for the purpose, and that the patentees were to be "responsible for the perfect construction and performance of the boat." In the agreement which was afterwards made and executed between *Fulton* and a majority of the company, in respect to their shares, the same engagement, with some additions, was entered into, so far as *Fulton* was concerned. He was to be responsible for the perfect construction and performance of the boats, so as to carry at least 100 tons burden, and to run at least four miles an hour in still water. The whole *gravamen* (if any) to be deduced from the pleadings and proofs, appears to me to consist in the failure of the engagement as to the construction and performance of the boat.

The *Livingstons* deny that *Latrobe* was their agent, or that he made these proposals, by their authority, assent, or knowledge. They equally deny any authority in *Fulton* to bind them by such a contract.

The great point in the case is, whether there is evidence of any such authority existing at the time, or of any subsequent recognition of it.

The contract of partnership entered into between the late *Robert R. Livingston* and *Fulton*, on the 10th of *October*, 1802, does not appear to contain any power that touches the case. That contract provides for the construction of a passage boat, moved by the power of the steam engine, to be used on the *Hudson*, and that the patent for such a boat should be taken in the name of *Fulton*, and the property thereof equally divided, and also the emoluments of it; and that the number of boats, offices and agents, should be augmented or diminished, as the parties should think proper, and that if either party should die within the 14 years, or before the termination of the patent, his heirs or assignee should be considered an active partner.

This was a very special partnership, and certainly contained no power in one party to bind the other, by a covenant as to the construction of boats to be built by third persons for their own use, under a patent license.

This was the only instrument declaring the association between *Livingston* and *Fulton*, during the life time of the former. But, afterwards, on the 25th of *July*, 1814, there was a new agreement between *Fulton* and the two representatives of *Robert R. Livingston*, deceased. That agreement recited that they were sole proprietors and acting partners in the rights and privileges of steam navigation, for which patents had been issued, and divers statutes passed in favour of the parties, in pursuance of the agreement of *October*, 1802, and that they were desirous to modify the articles, as to the *Hudson* river, and to explain their rights in certain particulars, leaving the articles in force, in other respects. The parties to that agreement, in the 7th and 8th articles of it, entered into certain stipulations, which referred to the *personal services* rendered

by *Fulton*, in the concerns of the general establishment, and in superintending the making and completing the steam boats then building, viz. one for the *Mississippi*, one for the *Ohio*, and two for the *Hudson* ; and the 7th article evidently contemplated, that the profits of those personal services would have been a joint concern without the modification there agreed to.

The plaintiffs aver, that the boat alluded to in those articles, *as building on the Ohio*, was the one in question in this case, and the answer of the representatives of *Fulton* admits the fact, and the answer of the others does not deny it. They admit that the article may allude to their interest in those boats, as part owners of the patent rights and privileges. But if it does, what then? The *Livingstons* had an interest, no doubt, under their articles of 1802, in all emoluments resulting from the patents for steam navigation, and the sales and licenses under them; and the *Personal* services alluded to in those articles, were, no doubt, those bestowed on subjects and property, in which the parties had a common interest. But did that interest bind them to *Fulton's* contracts for building boats? I think it would be dangerous to push to this extent, the authority of each partner under the articles of 1802, or the modification made, or construction given to them, by the agreement of 1814. A joint interest in a patent may exist in full force, and yet have no connection with a special covenant to construct a boat for the benefit of an assignee. Such a power is no necessary part of the joint concern. The *Livingstons* may have an interest in all the branches of steam navigation arising under the patents, and even in the personal services of *Fulton* bestowed on their common concern, without being bound by his special undertakings. There must be some other authority to bind them than what is to be deduced from the articles of 1802. The modification in 1814, gave no new power to each partner. This was clearly not within its intention. It only regula-

ted their then existing interests. A covenant to superin-́ tend the building of a boat for the benefit of a company, was quite a separate transaction. It had no more connec- tion with the enjoyment and exercise of their community of privileges under the patent, than if there had been a covenant to procure the wood and iron for the boat, or to superintend the navigation, and freight, or cargo of her, when in service. The price of a license to build and use a steam boat, may enure to the defendants jointly; so if an interest be reserved in the boat in connection with the purchasers, that interest might be joint. These are plain partnership rights which are intelligible to all. But if upon the sale, the purchaser should have contracted with *Fulton*, as he would with a shipwright, to build the boat, or as a captain to navigate her afterwards, would any person have naturally conceived that such a contract was also a part- nership business, and bound equally all persons interested in the patent? These are, in their nature, personal, not partnership concerns, and to make the partnership liable, a special agreement from the partners must appear. There must be some authority beyond the mere circumstance of partnership, to bind the *Livingstons* to this covenant.

Though *Latrobe* subscribed his printed proposals as agent for the *Ohio* steam boat, and for the patentees, there is no evidence that the *Livingstons* ever authorized or ac- knowledged his agency. He was the agent of *Fulton*, and of him only. Not a witness traces any act or confession to the *Livingstons*, that contains the least recognition or acknowledgment of any authority from them, either in *Latrobe* or *Fulton*, to issue those proposals, or to carry them into effect. Those witnesses who understood or be- lieved that the *Livingstons* were jointly concerned in cir- culating, or in avowing, or in acting under those proposals of *Latrobe*, do not give us a single act or confession of theirs, to warrant the conclusion or belief. The expenses were defrayed by *Fulton*, and the drafts were all upon

him. He declared to *Hoffman*, a clerk of the defendants, that the *Livingstons* were not interested in the expenses of that boat, and they told that witness the same thing. The only circumstance from which they could possibly be charged is, that knowing of those proposals, they preserved silence, without giving notice to the plaintiffs, or to the public, that they were not bound by *Fulton's* engagement.

But what reason had they to presume that any person was in an error on that point? We have no evidence that the plaintiffs were imposed upon by that silence. The knowledge of the contract is not traced up to the *Livingstons*, at any very early period of it. They had no interest whatever in the patents, when the proposals issued, and were made known in *March*, 1813. The interest of the late *Robert R. Livingston* was then vested, by will, in his widow. This will and its contents the defendants were called upon by the bill to disclose, and it is decisive that the proposals of *Latrobe* could not have been their proposal. Their existing rights did not accrue until *October*, 1813, and by that time the company was formed, and *Latrobe* as *Fulton's* agent, had commenced the building of the boat. The case has no analogy to those in which silence is construed into tacit assent, and as evidence of imposition. These defendants never came in contact with the operation. They were never consulted or applied to on the subject. These two defendants were well known to most of the plaintiffs, and accessible to them almost daily; and yet, while this contract between the plaintiffs and *Fulton* was made, and was carrying into operation with great expense, and much correspondence and negotiation, for the space of two years, not one solitary communication was made from either of the plaintiffs to them. The plaintiffs dealt with *Fulton* exclusively, and took no notice of these defendants; yet they now contend that those defendants were parties to their contract, and equally responsible

with *Fulton.* I do not think that the plaintiffs are entitled to complain of silence.

2. But admitting that the *Livingstons* were bound equally with *Fulton,* the next point to be considered is, were the plaintiffs entitled, under the circumstances of the case, on the 25th of *April,* 1815, to abandon the boats, and to call upon the representatives of *Fulton* to refund the moneys they had expended, with interest?

The plaintiffs cannot justify their attempt to rescind the contract from any delay in the progress of the work; for after the death of *Fulton,* they assumed the business themselves, and directed *Cooke,* their agent, to press on the work with all diligence, and to start the boats as soon as possible. This is what one of the plaintiffs writes, on the 29th of *March,* 1815, as secretary to the company, after stating that the company had met and taken *a view of the whole case.* It is also to be observed, that there was no time limited, in any contract on the subject, for the completion of the boats.

Nor does it appear to me that the plaintiffs can be permitted to set up the extraordinary expenses incurred under the agency of *Latrobe,* as a justifiable cause for rescinding the contract. There is some explanation given of the cause of an excess, far exceeding the original calculations of the plaintiffs and of *Latrobe,* in the fact, that the then existing war had rendered labour and materials, especially iron, extremely dear. This is so stated by one of the witnesses. But though I can readily suppose the plaintiffs were afflicted by their mistaken calculations of the expense, and that there was very justifiable cause for removing *Latrobe,* yet I do not perceive any specific engagement of *Fulton* on this point. He was to be responsible for the construction, but not for the expense of the boat. And when the plaintiffs, by their resolution of the 9th of *September,* 1814, requested the discharge of *Latrobe,* and he was accordingly discharged, and another agent

agreeable to them appointed, the plaintiffs may be considered as renouncing their right to rescind the contract, on the ground of his extravagant expenditures. Above all, are they precluded from this objection, by their new agreement with *Fulton*, on the 7th of *January*, 1815, and which was signed by a majority of the plaintiffs in interest. They therein acknowledge that the expenses had then exceeded, by 12,000 dollars, the original capital stock, and yet they determine to persevere on a new plan, and with still increasing expenses.

I see no ground on which they could justifiably abandon the contract, unless it should be for a breach of it, as to the construction of the boat. There is no other specific engagement by *Fulton*, either in the printed proposals of *Latrobe*, or in the articles of agreement of *January*, 1815, which they can allege to have been broken.

The boat, according to *Latrobe's* proposals, was to be built under the direction of the patentees, who were to appoint an agent for that purpose, and who were to be responsible for the perfect construction and performance of the boat. *Fulton* assumed these proposals as his own, and recognised *Latrobe* as his agent in making them. He was, consequently, responsible to the company for the fulfilment of this contract, and how was it performed?

An agent was appointed for the purpose, and the building of the boat commenced at *Pittsburgh*, under his agency, in *October*, 1813. We hear no more of the business, until *July* 10th, 1814, when *Fulton* wrote a letter to *Latrobe*, (for I have looked at every paper without nicely weighing its competence, in order to inform myself of every fact,) and in that letter he acknowledged that a boat was to be built, in the best possible manner, to suit the waters of the *Ohio*, and that *Latrobe* had misapplied funds, by building shops, when *Fulton* had them of his own. In *September* following, the company met and insisted that *Latrobe* should be discharged, and say that they would not

advance any more funds until he was discharged. It was, accordingly, done; and the great head of complaint was his expenditures, and not the construction of the boat. *David Cooke* was appointed his successor, and the steam boat was launched at the time *Latrobe* was dismissed. The work then goes forward, and, for any thing that appears in the case to the satisfaction of both parties, until the 7th of *January*, 1815, which forms a new and important epoch in the history of the business. A majority in interest of the company and *Fulton*, enter into a new agreement, in which, for the first time, the company appear to assume form and substance as a regular co-partnership. We cannot doubt but that they possessed, at the time, all the knowledge that belonged to the subject. They knew what had been previously expended, and how extravagantly it had been expended, (if extravagant at all,) by *Latrobe*, and they knew the apparent size and construction of the boat, and that she was already afloat. It cannot be supposed that they were ignorant of all this, and they must have known as well as *Fulton*, the depth of the waters of the *Ohio*, for this was a matter of public notoriety, and was a knowledge essential to the business they had assumed. They, then, armed with this information, enter into a new and very special agreement with *Fulton*, in which it was contemplated, no doubt, that the other defendants would become parties. This agreement recites the substance of the former proposals of *Latrobe*, under which the company had formed themselves and hitherto acted, and it declares that the *building of the boat had been changed in plan*, so as to add thereto a *freight boat*, to be towed; and, notwithstanding the expenditure then made of 37,000 dollars, they agree to advance the further moneys requisite to finish the boats, and they preserve the responsibility of *Fulton*, for the *perfect construction and performance of the boats*.

I cannot but be of opinion, that this new agreement superseded, altogether, the claims of the parties under the

vague and undefined terms of the printed proposals. It was the substitution of a new and formal contract to that preliminary arrangement, in which the plaintiffs, for the first time, appear distinctly as a regular associate body. They adopted the boat as she then was, and the question is, whether there was a failure in the construction of the boat, in the *April* following, so as to warrant the plaintiffs to rescind or abandon the contract, and call for the return of their money?

The articles in *January*, seem to have defined the meaning of the engagement to be responsible for the perfect construction and performance of the boats, by adding thereto these words, *so as to carry, at least, one hundred tons burden, and run, at least, four miles an hour in still water*. Nothing is here said as to her draft of water. *Cooke* says she drew three feet of water when empty. This fact must have been known when the agreement in *January* was made. There is no doubt that the parties adopted the plan of the tow boat, to meet and avoid the inconvenience of the weight and draft of water of the steam boat; for *Butler* testifies, that in 1814, or 1815, *Fulton* suggested the plan of the tow boat, because it was ascertained that the steam boat, with her cargo, would draw too much water for the *Ohio*.

But, considering the covenant without any such accompanying explanation, and as meaning, by a perfect construction and performance, a boat suitable to the waters of the *Ohio* between *Pittsburgh* and *Louisville*, the question occurs, have not the plaintiffs adopted the boat as it was? and are they not precluded from saying she was too large?

The difficulty and uncertainty of navigating on the *Ohio*, seems to have occurred from the beginning. The original proposals of *Latrobe*, contemplated that the boat would "lie by" in *July* and *August*, on account of the lowness of the water; and that she would not make more than five or

1817.

LAWRENCE
v.
DALE.

six trips, each way, during the year. The parties were accordingly, when they subscribed these proposals, duly apprised of this difficulty, and of the inevitable interruption of the navigation, and all their contracts must be construed in reference to that navigation as it was then known and declared.

The lamented death of *Fulton* occurred soon after the execution of the agreement in *January*, and the plaintiffs then took into their own hands the care of finishing the boat, and pressed on the work, with zeal, until the 26th of *April*, 1815, when, in consequence of information received from *Stoudenger*, they came, suddenly, to the resolution, that the steam boat *would not answer*, and that the contract was, consequently, *void*, and demanded repayment of their money. What information they had received, which satisfied them the boat would not answer, is not stated. Nothing is shown to have existed then, which was not known to them six months before; and the only complaint in the letter announcing the resolution to abandon, relates to the expense.

All the information we have, on the head of the failure of the contract in respect to the construction of the steam boat, (for there is no complaint of the tow boat,) is derived from the three witnesses at *Pittsburgh. Frisbie*, who undertook to finish the carpenter's work of the boat, thinks the former work not quite so good as his own, though it would have borne inspection, and the boat was a littled *hogged* in launching. *Cocke* says the boat was, upon the whole, pretty well built, and better than the well-known *Hudson* river boats, *Car of Neptune* and *Paragon ;* and that the machinery was good. There is, then, no real objection to the workmanship of the boat, to justify the relinquishment of the contract; and when the plaintiffs said *she would not answer*, they most certainly had no such imperfection in their view. It was the depth of water she drew to which they alluded.

*Frisbie* says, that the boat, according to her original plan or contrivance, would have drawn too much water, to have rendered her fit or convenient for the navigation intended for her; that she might have made one trip in the spring, and one in the fall; and, if ready when the waters were high, have made several trips in the year. *Rowe* speaks to the same effect. *Cooke* says, that the boat drew three feet when empty, and when loaded would have drawn four feet; and that she could have navigated the *Ohio*, except in very dry seasons, or in winter, and could have run, on an average, six months; but he admits that a boat, to navigate to the best advantage on the *Ohio*, ought not to exceed three feet draft.

The answer to this testimony is, that the parties knew, when the boat was launched, in *September*, 1814, what water she would draw when empty. They modified the contract, and altered their plan in *January* following, to suit that draft of water, by adding the tow boat, and I cannot see what right or equity they have to complain now of the original construction of the boat. If they intended to have abandoned the boat for that cause, they should have done it when she was launched, and when an accurate judgment could have been formed, and probably was formed, as to the water she was to draw. Instead of that, they go on and adopt her as she was, and continue their work upon her, and, afterwards, vary their original plan to meet the size and weight of the vessel. The construction of the boat was the same then, as when they gave up the contract.

But there is a material defect of testimony on the point of the navigation of the *Ohio*. *Frisbie* says he is not well acquainted with that part of the *Ohio* between *Pittsburgh* and *Louisville*, and he speaks from the information of others. *Rowe* says, also, that he is not well acquainted with the waters of the river; and all that *Cooke* knows seems to be from inquiries of others. There is the same want of

precise and certain knowledge on this subject in the case before us, as there was when *Latrobe* issued his proposals, and gave his opinion as to the facility of the navigation of the *Ohio*. We have no chart, or soundings of the river, or testimony of men accustomed to navigate it. We have no actual experiment to inform us how far the boat was adapted to the river.

There is no fraud set up in this case, as a reason for rescinding the contract. There were no representations as to expense, however innocent, and however mistaken the calculations, but what the plaintiffs, with full knowledge of the fact, and of all the circumstances, have, again and again, waived; and if the boat was of so large a construction as to render her, in a great degree, unfit for the use intended, they should have taken their stand on the discovery of that construction, which discovery was made known to them, (as far, at least, as it is now made known,) when the vessel was launched. If the law allows a party to abandon a contract while *in fieri*, he ought, at least, to act promptly and decidedly, on the very first discovery of the breach. If he negotiates with the party afterwards, and permits the work to go on, he certainly waives all right to abandon. There is not a cause to contradict this doctrine, which is founded on the plainest principles of justice: and if there had been no waiver, nor adoption of the boat, I should still think the testimony of the boat's unfitness for the *Ohio*, too imperfect to justify so extraordinary a measure, as the absolute renunciation of the entire contract. Having carried the work so far, I think they ought to have brought the question of the fitness of the boat to the waters, *to the test of experiment*. It does not appear, to this moment, but that the steam boat, with the aid of the tow boat, might have performed as many trips in a year as was in contemplation of the original proposals. Instead of waiting for a trial, the plaintiffs, in a moment of despair, and duly admonished of the fallacy and

danger of such speculations, give up the contract, and leave the boats to be sacrificed on execution, and now call upon this court to decree the repayment of their money from the representatives of *Fulton*. I feel and regret their misfortune, but I cannot transfer that misfortune to others, without better evidence than this case affords.

The bill, as to all the defendants, must, consequently, be dismissed; and as to the two *Livingstons*, it must be dismissed with costs.

Decree accordingly.