## AULD ET AL. v. TRAVIS.

1. AGISTOR'S LIEN.

A partner cannot acquire an agistor's lien upon stock belonging to his firm.

2. RESCISSION.

When a party has an election to rescind a contract, he must rescind it wholly or not at all.  He cannot consider it void for one purpose and in force for another.

3. SAME.

If a party having the right to rescind a contract does any act which amounts to an admission of its existence, he cannot afterwards elect to treat it as void.

4. SAME.

Where the *status quo* cannot be restored, there can be no rescission.

5. SAME.

When a party, by reason of fraud or failure of the other party to perform, has the right of rescission, he must exercise it as soon as the fraud comes to his knowledge or the default occurs.

*Appeal from the District Court of Saguache County.*

ON THE 19th day of October, 1892, appellee, Chas. E. Quincy, and W. F. Reed, by a written agreement, became partners, for purchasing, feeding, handling and marketing cattle for a term of five years.

Appellee, a ranchman, leased to the partnership, for the purpose of pasturage, three tracts of pasture land aggregating about 5,700 acres.  By the terms of the contract, appellee was to furnish the land as his contribution to the capital of the firm free of rent and charge.  Quincy agreed to furnish as many cattle as could be handled profitably, at the market price of cattle, take entire charge of the cattle, and manage the entire business, including the employment of assistants, the purchase of new stock, and the sales of cattle.  Reed was to furnish the money necessary for current expenses of the partnership, not to include the purchase of cattle ; the profits of the business to be divided equally between the three partners.

Pursuant to such agreement, on the 21st of October, Quincy brought to the ranch of Travis 603 head of cattle, and placed them on the fields designated in such contract. On October 28th he brought other 444 head of cattle, and disposed of them in like manner. On the premises set apart upon the contract Travis had cut and stacked a quantity of hay, estimated at 400 tons. Such hay was measured by Travis, and turned over by him to Quincy for the use of the partnership, for which he was to receive pay proportionately from his partners at the rate of $4.50 per ton for so much as was used. Upon measurement there was found to be about 280 tons, all of which was fed to the stock.

Under the contract, Quincy took entire control of the supervision, management and feeding of the cattle, employing and controlling all help. Travis turned over the possession of the different tracts of land designated, and the hay, but exercised no control or supervision whatever. The cattle were bought by Quincy from appellants, Auld and McCorkle, upon credit, and a chattel mortgage was executed by him to secure the purchase price.

On the 16th of March following, it is alleged the cattle were attached as the property of Quincy on a writ from Arapahoe county. Thereupon, under the provisions of the mortgage, appellants took possession of the cattle, or, being about to take such possession and remove them, appellee brought this action, alleging in his complaint:

1st. That he was a ranchman; that on October 21st and 28th, 1892, Quincy brought to his ranch, and *intrusted to him for the purpose of feeding, pasturing and keeping,* the 1,047 head of cattle; that the cattle were by him, as *agistor,* pastured and kept until the 17th of March, 1893, and that the pasturage was worth $1,534.40; that from and after December 3, 1892, *he, at the special instance and request of Quincy, fed the cattle 280 tons of hay owned by himself,* for which Quincy agreed to pay him $4.50 per ton, amounting to $1,260.

2d. That defendants Auld, McCorkle and Hall were about

to take the cattle from his possession by virtue of two chattel mortgages given by Quincy to Auld.

3d. That the mortgages were not recorded in Saguache county at the dates the cattle were delivered to him.

4th. That at the time of receiving the cattle he had no notice, constructive or otherwise, of the existence of the mortgages.

5th. That the taking away of the cattle would deprive him of his lien as *agistor*, etc.

Prayed an *ex parte* injunction, and asking that his lien be declared superior to any other lien, etc.

On March 18th, an injunction was granted on a bond of $400 ; summons and writ of injunction served same day upon McCorkle and Hall ; no service upon Quincy or Auld. On April 6th, Auld, McCorkle and Hall answered, denying that the cattle were ever intrusted to the plaintiff for the purpose of feeding, pasturing and keeping, or for any purpose ; that plaintiff had kept and pastured the cattle as an agistor or in any capacity ; that plaintiff fed any hay to the cattle, or that the hay was the property of the plaintiff ; admitted that the cattle were pastured upon the land described, etc.

For a second defense, set up that Quincy wished to purchase cattle upon time ; exhibited, as inducement, the articles of partnership between Travis, Reed and himself ; that the purchase price of the cattle was agreed upon ; that McCorkle went with Quincy to plaintiff's lands and examined them with a view of ascertaining the relation of the parties to the agreement, and their ability to care for the cattle ; that plaintiff declared himself a member of the partnership, and represented that all the lands and the hay upon them were to be used exclusively for keeping the cattle.

That, relying upon the representations made, the cattle were sold, notes taken, secured by chattel mortgages, which also embraced the hay, which had been sold by the plaintiff to Quincy ; that the plaintiff had actual and constructive notice of the mortgages, and that they were duly recorded.

That immediately upon placing the cattle on the premises,

cattle and hay were given up to the charge and possession of Quincy, and that during all the time Quincy had open, exclusive and undisputed possession; that plaintiff had no possession nor rights except under the contract, etc.

That in February and March, 1893, plaintiff, in violation of his contract, did claim an agistor's lien upon the cattle, and threatened to hold them as against the mortgages; alleged the suing out of the attachment against Quincy and the levy, and admitted the taking of the possession under the chattel mortgages.

On March 27, 1893, the court overruled a motion to dissolve the injunction, but increased the bond to $2,500. Afterwards, by stipulation of parties, the injunction was dissolved upon payment by defendants into court of $1,534.40, and the giving of a bond in the sum of $1,400, for the benefit of the plaintiff, in case he obtained final judgment.

Subsequently a trial was had to the court, resulting in the following finding and judgment:

"Wherefore it is ordered by the court that plaintiff's lien as agistor be and is hereby decreed a superior lien to lien of defendants' mortgages, or any other lien of defendants; and the court having found that there is due and owing plaintiff by defendants, Auld and McCorkle, the sum of $1,721.70, by reason of the premises, therefore it is ordered and adjudged by court that plaintiff do have and recover from said defendants, Auld and McCorkle, the sum of $1,721.70, with costs, and that the $1,534.40 deposited by defendants with clerk hereof be applied to satisfaction of said judgment; and the bond of defendants given to secure any judgment in this cause is declared in full force and effect,"—from which an appeal was prosecuted to this court.

Mr. JOHN S. MOSBY, JR., and Mr. F. W. LINEAU, for appellants.

Mr. CHAS. D. JONES, Messrs. McINTIRE & McDONALD and Mr. EMERSON J. SHORT, for appellee.

REED, J., delivered the opinion of the court.

Our statute giving a lien to an agistor is as follows (2 Mills' Stats., sec. 2854; Gen. Stats., sec. 2118; Amended Acts of 1889, p. 232): "Any ranchman, farmer, agistor, herder of cattle, tavern keeper, livery stable keeper, or other person to whom any horses, mules, asses, cattle, sheep or hogs shall be intrusted for the purpose of feeding, herding, pasturing, keeping or ranching, shall have a lien upon such horses, mules, asses, cattle, sheep or hogs, for the amount that may be due for such feeding, herding, pasturing, keeping or ranching, and for all costs incurred in enforcing such lien." * * *

The suit was brought under this section of the statute to secure and enforce a lien upon the cattle for the food consumed.

"Agistment is where a person takes in and feeds or depastures horses, cattle, or similar animals upon the land for reward." The lien for agistment is purely statutory; no lien existed at common law. Chit. on Cont., 435; 1 Smith Lead. Cases, 222; *Jackson v. Cummins*, 5 M. & W. 341; *Smith v. Cook*, 1 L. R. Q. B. Div. 79. The agistor had no lien except by special agreement. *Goodrich v. Willard*, 7 Gray (Mass.), 183; *Miller v. Marston*, 35 Me. 155; *Grinnell v. Cook*, 3 Hill (N. Y.), 485.

The language of our statute giving the lien is: The "person to whom any * * * cattle * * * *shall be intrusted for the purpose of feeding, herding, pasturing, keeping or ranching,*" etc.

The lien is for the food and care expended upon the cattle of another, where the cattle are intrusted to his care. They must be delivered into his possession and subject to his control, and the bailment is such, and his possession so exclusive, that he may maintain trespass or trover against a wrongdoer for any injury to their possession,—Story on Bailments, sec. 443; *Sutton v. Buck*, 2 Taunt. 309; *Rooth v. Wilson*, 1 Barn. and Ald. 59; *Burton v. Hughes*, 2 Bing. 173,—and is

only responsible for ordinary negligence. Jones' on Bailments, 91 and 92; *McCarthy v. Wolfe*, 40 Mo. 520.

The complaint makes a case clearly within the law of agistment, entitling, if sustained by evidence, the plaintiff to the lien: That from October 21st and 28th until December 3d, Travis, *as agistor*, had pastured the cattle; "that from and after the last date, and until March 17, 1893," at the special instance and request of said Quincy, he, Travis, fed hay owned by him to said cattle, etc.

By the second paragraph of the contract above cited, it is obvious that the plaintiff leased to the partnership, of which he was a member, the real estate described, with all the rights and easements pertaining, and, as shown by a subsequent paragraph, for the term of five years. Such leasing was exclusive of any individual right or possession of the plaintiff. By the terms of the contract, Quincy was to manage the partnership affairs, and, for the partnership, to enter into the possession and exercise sole control of the leased premises.

Pursuant to the contract of partnership, a few days after its execution, Quincy purchased from the defendants Auld and McCorkle the cattle, 1,047 in number, received the possession of them, placed them upon the land leased from the plaintiff, and during all the time, until possession was taken by defendants Auld and McCorkle, had exclusive custody, management and control of them, under the provisions of the contract.

It is alleged in the complaint that the cattle were intrusted to him (plaintiff) by Quincy, and that he fed the hay to them at the special instance and request of Quincy. Such being the allegation, even if established by the evidence, we are at a loss to understand how a judgment and decree could be entered against Auld and McCorkle, who had never delivered cattle into his possession, intrusted him with hay, or made any contract for feed or care.

It is evident from the contract, and all the evidence in the case, that the three tracts of land were devoted to partnership uses by the plaintiff. Quincy was to buy cattle at market

rates, and manage the entire business; the third partner to furnish the money for current expenses. Cattle were to be pastured upon the leased premises, fed when necessary, and marketed. The cost of purchase of cattle, cost of caring for them, and feed, aside from the pasturage from the leased land, were to be deducted from the amount realized, and the profits arising from the transactions divided equally between the three partners. The contract did not provide that Quincy should purchase the cattle for cash. The evidence of plaintiff shows that he understood that the cattle were to be purchased upon credit, and at the time the cattle were delivered knew that they were purchased upon credit by Quincy. Consequently, until rescission of the contract of partnership, or until the title of the partnership was divested by default in payment of purchase money, the cattle were the property of the firm and in its possession, and under the management of Quincy, who was, by the terms of the contract, invested with the care and control. Hence we find the plaintiff attempting to assert an agistor's lien against his own property, as well as that of his partners, for pasturage he had conveyed to the firm as his contribution to the capital stock, and for hay sold and delivered to the firm, one third of which, upon settlement, was chargeable to him, and the other two thirds to be paid by his partners.

This brief statement shows the impossibility of maintaining a lien, where the requirements are: *First*, that the cattle should be the property of another, in which the agistor had no rights of ownership; *second*, that the stock was delivered for the purposes of the agistment under a contract of hire, with an agreement to pay for the food and care.

The contention of plaintiff is that, by failure of Quincy to perform his part of the agreement, he had a right to and did rescind the contract of partnership, and that it was void. If such were the fact, how could it affect Auld and McCorkle, who had dealt with the partnership in good faith, sold and delivered the cattle to the firm, and who had no notice of dissolution, nor protests? In other words, how could a lien be

enforced against the property of Auld and McCorkle by reason of the failure of Quincy to perform his agreements with his partners?

The plaintiff contends that he rescinded the contracts of the purchase of the cattle and the partnership *ab initio*—*First*, because chattel mortgages were given without his knowledge to secure the purchase price; *second*, because Quincy had purchased the cattle above the market price. . These contentions may be briefly answered. First, they were matters with which Auld and McCorkle had no connection, and of which they had no knowledge.

. He testified to his lack of knowledge, but from his testimony it is impossible to determine when he first had knowledge of their existence. The mortgages were recorded very shortly after their execution. He testified that he had no knowledge before they were filed for record. Again, that he had *actual* knowledge by a letter from the recorder, of January 20th, and had heard of them before that time. Again, knew they had mortgages about the first of March. There is much evidence from which it might be inferred that he had knowledge about the time of the purchase, but inference is unnecessary. He, by his own evidence, fixes the date sufficiently early for the purposes of this case. As a purchaser, it was his duty to know at the time of the transaction. If he failed to know by reason of his own negligence, the responsibility rests upon himself. There is no attempt to charge any of the parties with concealing the fact from him. Whether he knew or not could not affect the rights or property of Auld and McCorkle, and as his share was in the profits, after payments of purchase, it seems a matter of no legal importance whether the purchase price was secured by chattel mortgage or in any other way; the price was to be paid at maturity of notes.

As to the supposed rescission of the contract, either in purchase of the cattle from Auld and McCorkle, or the contract of partnership,—as it seems very uncertain which is claimed to have been rescinded,—the testimony of plaintiff was pecu-

liar as a basis for rescission. Although the cattle were purchased by Quincy and delivered to the firm, upon the ranch, he did not know the price of the cattle until a week after their delivery; that he said nothing to McCorkle at that time; *didn't know that he had any interest in the cattle*, and didn't know Quincy bought them from him. In view of another part of the testimony, these statements are rather startling. Before the sale McCorkle visited the ranch, examined pasturage and hay which was shown by the plaintiff. The object of such investigation must have been stated, if not apparent, to ascertain if there was an adequate supply of food, so that his security for the purchase money would not be jeopardized. These circumstances must have conveyed, to any man of ordinary intelligence, the facts: *First*, that the cattle were to be purchased upon credit; and, *second*, that the seller would rely upon the cattle as security. He also testified that he did not ask Quincy or McCorkle the price paid; *that he did not know the price on November 1st*, when requested to sign the note; did not figure from them the price, *because he knew they were too high;* that he knew the price before or at the time the second lot were delivered, *which was October 28th*, as Quincy had told him. Comment upon these two statements is unnecessary. He also testified that upon learning the price of the stock he (mentally) repudiated the contract of partnership, did not accept the cattle as partnership property, but for the purpose of pasturage; but did not inform either Quincy or McCorkle of his repudiation or intention until some time in February, allowing his partners to continue the feeding and care of the cattle and expenditure of money until that date, under the partnership contract he had repudiated at its inception in October. After the food was consumed, and it became evident that his supposed speculation was a failure, he gave notice of his rescission, and attempted to shift his position and become an agistor instead of a partner.

It is a well settled rule of law that when a party has an election to rescind an entire contract, he must rescind it

wholly or in no part. He cannot consider it void for one purpose, and at the same time in force for the purposes of recovering damages. 2 Chit. on Cont., 1089; *Miner v. Bradley*, 22 Pick. 457; *Voorhees v. Earl*, 2 Hill (N. Y.), 292; *Junkins v. Simpson*, 14 Me. 364; *Coolidge v. Brigham*, 1 Met. (Mass.) 550.

If a party, having the right to rescind a contract, does any act which amounts to an admission of the existence of the contract, he cannot afterwards elect to treat it as void. *Brinley v. Tibbetts*, 7 Greenl. 70; *Lindsey v. Gordon*, 13 Me. 60; *Barry v. Palmer*, 19 Me. 303; *Lawrence v. Dale*, 3 Johns. Ch. 23; *Masson v. Bovet*, 1 Denio, 69; *Selway v. Fogg*, 5 M. & W. 83.

It is shown by all the evidence, including that of plaintiff, that although knowing the price paid for the cattle in the latter part of October, and mentally resolving to rescind at that time, he gave no notice of any such intention, acted under the contract, carried out its provisions, and recognized it as binding and obligatory until some time in February following.

Another well settled rule of law is that one party to a contract cannot rescind when both cannot be placed in the identical situation which they occupied when the contract was made. Where this cannot be done, there can be no rescission, and the party must proceed for damages for failure to perform. 2 Chit. Cont., 1092.

There is practically no limit to the number of cases, English and American, asserting the proposition. It at once becomes apparent that it was impossible in February to place the parties in *statu quo* as of October previous.

It is also an equally well settled rule of law that when a party, by reason of fraud or failure of the other party to perform, has the right of rescission, he must exercise it at once, as soon as the fraud comes to his knowledge or the default occurs. 2 Pars. on Cont., 797; *Central Bank v. Pindar*, 46 Barb. 467; *Burge v. Railroad Co.*, 32 Iowa, 101; *Zuck v. McClure*, 98 Pa. St. 541; *Wilson v. Morse*, 52 Wis. 240.

A party cannot play "fast and loose" at the same time, await results, and then make his election.

As to the 280 tons of hay fed to the cattle, plaintiff's testimony shows it to have been measured up and turned over to Quincy at an agreed price of $4.50 per ton, to be fed to the cattle pursuant to an agreement. He became creditor of the firm. The hay amounted to $1,260, two thirds of which, or $840, should have been paid by his partners; but he testified that he, in the first instance, required money from his partners and they advanced him $1,000, a sum exceeding the two thirds of the value of the hay furnished.

. The finding and judgment of the district court cannot be sustained. The allegations in the complaint are not only not sustained by any evidence in the case, but contradicted by all of it, including that of the plaintiff. No single fact to bring the transaction within the law of agistment was established. The finding and decree of the district court will be reversed.

*Reversed.*