No. 15,043.

HEALD v. WESTERN REFINERIES, INC.
(146 P. [2d] 221)

Decided February 14, 1944.

Mr. E. V. HOLLAND, Mr. E. CLIFFORD HEALD, for plaintiff in error.

Mr. HARRY S. CLASS, Mr. L. BERNARD DAVIS, for defendant in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

THIS is a suit for attorney's fees based upon an annual retainer of $150 per month for a period of one year from September 15, 1937, to September 15, 1938, less three certain credits totaling $350, leaving a net balance due of $1,450 plus $36 service tax plus $124.25 interest, or a total of $1,610.25. Defendant, admitting the due execution of the contract of retainer, pled two defenses: that the plaintiff had failed, refused and neglected to represent defendant in a legal capacity as required of him in said employment, and also that he had failed, refused and neglected to work for the best interests of defendant, but instead worked for and represented interests adverse to those of the defendant, namely: his own financial interests in said defendant corporation. In a trial before a jury verdict was for the defendant and the unsuccessful plaintiff brings the case here on writ of

error. The parties will hereafter be referred to as in the trial court.

At the conclusion of the trial plaintiff moved for a directed verdict, and after the verdict of the jury, moved for a judgment notwithstanding the verdict. Both motions were denied. The ground for plaintiff's motions was that, "The failure of the defendant to discharge the plaintiff from its employ, the plaintiff's completion of his term of employment by the defendant, and the acceptance and retention by the defendant of the benefits of the contract, with full knowledge of all the facts, and its failure to rescind the contract, was a binding election on the defendant's part to continue and affirm the contract of employment, and, as a matter of law, requires the entry of judgment for the plaintiff." The court's refusal to grant these motions is the first specification of error, and the only one that we discuss.

The evidence showed that defendant had been incorporated in 1936 but had owned practically no property and was a mere paper corporation until 1937, when it acquired fifty-two per cent of the stock of the Mountain Refining Company and a lease running from that company under which, as lessee, it undertook to operate the refinery of Mountain Refining. Plaintiff had incorporated defendant company and was one of the original directors. The retainer contract was duly approved by the board of directors and set forth in the minutes of the meeting when the contract was approved. Plaintiff at that time held a director's qualifying share. In November 1937 he acquired from Stone, the president of the company, and had registered in his name 10,000 shares of stock of defendant company, and in March 1938 he acquired 63,000 shares, making a total stockholding of 73,000 shares under his control. This holding made him as large a stockholder as was President Stone, and they together had a voting control. Plaintiff testified that during the twelve months covered by his contract he gave almost daily attention to the business of

defendant company and its legal proceedings, contracts and negotiations (including those through which defendant acquired control of its refinery), conducted some litigation at its direction, qualified the company to sell stock and attended to its general legal affairs. At the end of the contract period he was still in the midst of the company's legal business—two suits were pending in Adams county which had not been determined and were under advisement, suits which he had prosecuted up to that point. The only legal actions he commenced were those authorized by resolution of the board of directors, and he instituted all suits which were so authorized. He testified that up to the end of his term he never had any difficulty with the officers or directors concerning the manner in which he was handling the company's legal business, the first objection offered being in defendant's answer in this case. During the period covered by his contract the company did not employ any other attorney for any purpose whatever. He attended the meetings of the directors, kept the officers informed, and did some travelling in connection with the company's business, such trips being authorized by the board of directors.

The company's journal showed ten different entries of $150 each, debiting legal expense and crediting E. C. Heald with that amount monthly from October 15, 1937, to and including July 15, 1938, and another entry September 15, 1938, covering salary from July 15 to September 15th, inclusive. It further appeared that plaintiff had instructed the assistant secretary-treasurer how to set up a system of accounts for the company and she, among other matters, had made the above mentioned entries at his direction, except for the last two of said entries. He also drew the charter, organization minutes, by-laws of the defendant company, prepared the minutes of directors' meetings until July 15, 1936. Beginning September 15, 1937, and up to the first of the year 1938, he prepared the minutes of some of the meetings, ap-

proved each minute during that period, prepared and approved the minutes of the meeting of January 4, 1938, prepared and supervised the minutes of the meeting of May 3, 1938, and approved the minutes of June 7, 1938. At the time of the adoption of the resolution employing plaintiff as company's attorney at $150 per month there was a similar resolution employing Stone as the company's president at the same salary. In addition to Stone and plaintiff, C. W. Thuringer and O. E. Mefferd were also directors, the former, a friend of Stone's, being described as simply an accommodation director.

The evidence introduced by the defendant to support its theory of nonliability falls into four groups:

(1) Stone testified that, in the latter part of April or in May, 1938, the plaintiff brought in a proposition to sell the refinery of the Apex Company to one Hayutin for the sum of $16,000. It was this refinery that later became the property of the Mountain Refining Company, and was then leased to defendant company. Stone did not look upon the proposition with favor. According to his testimony it meant that the stockholders of the Western Refining Company would get nothing, and it was the ensuing discussion over whether that proposition should be accepted or not that started the falling out between Stone and Heald in which each apparently lost confidence in the other. According to Stone's testimony, Heald, in the course of the conversation, made the statement that he did not give a damn for the stockholders, that he was looking out for himself.

(2) June 8, 1938, while plaintiff and Stone were in Thermopolis, Wyoming, on company business, Stone pointed out to Heald a Tagliabue recording instrument valued at $150 which he stated really belonged to the defendant company and instructed Heald to bring action to recover it. A week later, June 15, Stone claimed to have furnished Heald a list of other laboratory equipment valued at approximately $500 which had been stolen from defendant corporation, its predecessor or

lessor,. and was then apparently in the hands of another refinery company, and personally requested Heald to take legal action. This he refused to do. There was some question as to whether suit to recover the property in Wyoming, posting bond and employing Wyoming counsel would not involve expense that would not be justified. In any event, there was no resolution of the board of directors directing him to bring these actions for the recovery of the alleged stolen property, and the company continued to employ him on other matters as before.

(3) Subsequently Stone proposed to move the headquarters of the company to his own filling station (hitherto it had been in Heald's office); and matters between him and Heald became steadily worse until Heald served what he called an "ultimatum" on Stone regarding the form of the office management, which Stone and the other directors rejected definitely in the latter part of August, 1938. During these discussions Heald indicated he would take the following actions: (a) withdraw as the company's attorney at the end of his contract of employment; (b) call a stockholders' meeting and place his complaints before them; (c) apply to the courts for relief if the officers refused him access to the books for the purpose of obtaining the names and addresses of the stockholders. He did bring a mandamus action against Stone personally and after the termination of his employment obtained a judgment and peremptory writ of mandamus requiring him (Stone) to permit him to examine the books; (d) bring suit against Stone and the officers personally to compel them to transfer to him the voting power of the stock which he owned. Stone had refused to transfer the largest block of stock, which he had sold Heald, into the latter's name. After the termination of his employment, Heald did bring such a suit and obtained a judgment and peremptory writ of mandamus requiring the officers to transfer the stock into his name. We affirmed the

action of the trial court in *Stone v. Bradford & Company*, 103 Colo. 379, 86 P. (2d) 1119; (e) sell or offer for sale his stock in the company, which was of a par value of one cent per share, to the other stockholders at a price of ten cents per share (earlier that year one of the directors, also engaged as a salesman in selling the company's stock to the public, had been selling it at 33½ cents per share). After Heald's employment had terminated, he did offer his stock to some stockholders and sold some of it. It was also both alleged and denied that Heald threatened to wreck the company.

(4) Shortly after Labor Day, 1938, Heald apparently had some conversation and negotiations with Richard Downing, counsel for Mountain Refining Company, with reference to the annual stockholders' meeting of that company and obtaining the control of that company, and "probably a week or ten days after that" submitted an unsigned proposal in writing concerning the part that each should play in the affairs of that company.

Counsel for the defense rely upon the cases which hold that in the relationship of attorney and client the attorney is held to the highest degree of loyalty and singleness of purpose in representing his client, and that where he allows conflicting interests, including his own, to intervene or become paramount the client is then relieved of liability for services rendered. *Matter of Kelly*, 62 N.Y. 198; *People v. Gerold*, 265 Ill. 448, 107 N.E. 165.

Counsel for plaintiff contend that any evidence of incidents which might indicate plaintiff's self-interest or disloyalty was clearly apparent as the incidents occurred; that nothing was concealed and that, notwithstanding the foregoing incidents to which defendant now objects, it nevertheless used plaintiff's services to the end of the contract period; that Stone as president and the other directors under his control owned a majority of the stock of the company; that they could and did outvote plaintiff in the directors' meetings, and they were in a position to rescind plaintiff's contract of em-

ployment at the time that the matters now complained of occurred, but they did not do so; that this case therefore comes under the rule that a party who has the right to rescind a contract because of the default of another to such contract must at least act with a reasonable degree of promptness after knowing of such default or he waives his right to rescind for such cause. Applications of this rule can be seen in the following cases: *Wheeler v. McNeil,* 101 Fed. 685; *Ballard v. Carr,* 48 Cal. 74; *Auld v. Travis,* 5 Colo. App. 535, 39 Pac. 357; *Wood v. Casserleigh,* 30 Colo. 287, 71 Pac. 360; *Reynolds v. Hart,* 42 Colo. 150, 94 Pac. 14; *Olson v. Harvey,* 68 Colo. 180, 188 Pac. 751; *Davis v. Huber Mfg. Co.,* 119 Ia. 56, 93 N.W. 78; *Brownold v. Rodbell,* 114 N.Y.S. 846, 130 App. Div. 371.

We believe that the foregoing cases are in point. The first two cases listed deal with the employment of an attorney by his client. The remaining cases involve employer and employee, other than attorney and client. We believe that they also are pertinent, for, as stated by Judge Cooley in *Detroit v. Whittemore,* 27 Mich. 281, "The employment of counsel does not differ in its incidents, or in the rules which govern it, from the employment of an agent in any other capacity or business. The clerk of a merchant, the servant of a corporation, the laborer in a factory or on a farm, will recover his compensation on the same principles."

In many of the cases in which dealings between attorney and client have been set aside because of the over-reaching of the attorney, there have been some actual transactions out of which the attorney has unjustly benefited and the client has suffered some detriment. Such was the case in *Davis v. Swedish-American Nat. Bank,* 78 Minn. 408, 81 N.W. 210, cited by counsel for the defendant as one of their principal cases. But in the cluster of incidents relied upon by the defendant in this case it cannot be said that any transaction actually occurred out of which the plaintiff obtained some

benefit or the defendant suffered a detriment during the period of employment. Defendant's contention may be correct that the proposed sale of the refinery in April, 1938, when it was still owned by Apex, would have been detrimental to defendant, but that sale did not occur; the method of running the internal affairs of the company proposed by plaintiff may not have been advantageous to the company, but that method was not followed; and the sale of plaintiff's stock at ten cents a share may not have helped the sale of stock by the company's salesmen, but that sale occurred after the term of employment of plaintiff as counsel for the company had ended. The memorandum in regard to the management of Mountain Refining Company given to Richard Downing in regard to the operations and control of that company appears to have not been sent until shortly after the period of employment of plaintiff by defendant was completed, and seems to have had no effect upon the affairs of defendant company.

On the other hand, defendant made two payments of $100 each to plaintiff, on account of services as attorney, on May 7, 1938, and July 21, 1938, respectively. This was after the trouble with plaintiff had occurred and after plaintiff was alleged to have made his remark that he was not looking out for the other stockholders, which remark Stone testified he had communicated to the other directors. Defendant made another payment of $150 to Heald on August 18, 1938, when it was apparently in the thick of its trouble with plaintiff. After plaintiff had withdrawn from the company there was entered on its books by an accountant having no relation or connection with the plaintiff the $150 a month credits in favor of plaintiff for legal services covering the two months from July 15 to September 15, 1938. There was also entered in the minutes of the company on September 15, 1938, the following notation in regard to the culmination of the services of plaintiff: "The president then called attention to the fact that the agreement for

the employment of E. C. Heald as attorney for our company expired on September 15, 1938, and he asked what the directors desired to do regarding the same. Mr. Heald stated that he did not want to continue as the attorney for our company, and upon motion duly made, seconded and carried, it was resolved that the retainer of E. C. Heald as attorney for our company be discontinued this day and that he withdraw forthwith from all pending litigation and forthwith turn over to our company all of its papers, files, etc." It is clear that the defendant company took no steps to rescind its contract with plaintiff. On the contrary it expressly recognized it to the very end of its term. In the meanwhile, it availed itself of plaintiff's services under the contract. There is no question here of a latent or later-discovered fraud. The incidents on which the charges of disloyalty are based were known as they occurred during the period of employment. Defendant company did nothing at those times even intimating rescission, but continued to make use of plaintiff's services.

It therefore comes down to this alternative: (1) If there were no grounds for rescission, then defendant is not entitled to judgment; (2) if there were grounds for rescission, they should have been asserted when they occurred and became known in order to be availed of; and defendant cannot now use them as a defense in avoiding payment for contractual services performed over a period both before and after the incidents of which complaint is made. In either event, the judgment should be, and it is, reversed.

MR. JUSTICE GOUDY not participating.